**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**(Civil Division)**

| | |
|---|---|
| _____ ) | |
| **TERRI NORRIS**, ) | |
| P.O. Box 432 ) | |
| Simpsonville, MD 21150, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. _____ |
| ) | |
| **v.** ) | |
| ) | |
| **WASHINGTON METROPOLITAN** ) | |
| **AREA TRANSIT AUTHORITY**, ) | **Jury Requested** |
| 600 Fifth Street, N.W. ) | |
| Washington, DC 20001, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## COMPLAINT

**COMES NOW** Plaintiff, Terri Norris (hereinafter "Plaintiff" or "Ms. Norris"), by and through her undersigned counsel, and sues Washington Metropolitan Area Transit Authority (hereinafter "WMATA" or "Defendant"), and for cause of action states, as follows:

## NATURE OF THE CASE

1. Plaintiff Terri Norris (hereinafter "Plaintiff" or "Ms. Norris") brings this civil action pursuant to Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), as amended, 42 U.S.C. § 2000e, *et seq*., the Age Discrimination and Employment Act of 1967 (hereinafter "ADEA"), and the District of Columbia Human Rights Act (hereinafter "DCHRA"), for relief from Defendant's sexual harassment and discriminatory conduct towards Plaintiff on the basis of her gender, as well as Defendant's retaliation for Plaintiff's protected activity.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331, as it asserts a claim that arises under laws of the United States, specifically Title VII and the ADEA, as well as the DCHRA.

3.     Venue is appropriate and based on the fact that a substantial part of the actions complained of are the result of actions and the employment practices of Defendant, a municipality within the District of Columbia. *Id.*

## EXHAUSTION OF REMEDIES

4.     Plaintiff has exhausted all of her administrative remedies.

5.     On August 14, 2014, Plaintiff timely contacted the Office of Equal Employment Opportunity (hereinafter "OEEO") within WMATA and filed a formal complaint against her supervisor, a male Assistant Superintendent BTRA, alleging quid pro quo sexual harassment.

6.     On or about September 16, 2014, Plaintiff submitted a Form 5 Charge bearing Agency No. 846-2014-22755 to the Equal Employment Opportunity Commission (hereinafter "EEOC") alleging that WMATA had violated Title VII, the ADEA, and the DCHRA due to discrimination based upon gender (female) and age (DOB 12/17/1963), both quid pro quo and hostile work environment sexual harassment, and retaliation for filing a complaint of sexual harassment, a protected activity.

7.     On October 21, 2014, Plaintiff received a notification from the EEOC indicating that the investigation in her complaint against her supervisor was complete, that her supervisor had denied each and every allegation made in the complaint during his interview with the EEOC, that there were no witnesses to substantiate the allegations, and that the EEOC ultimately found no probable cause for Plaintiff's complaint.

8.      On July 25, 2016, Plaintiff received a "Notice of Right to Sue" from the Department of Justice (hereinafter "DOJ"), which provided her the right to institute a civil action in federal District Court under Title VII within ninety (90) days.

9.      On October 24, 2016, Plaintiff timely filed her action within ninety (90) days after receipt of the DOJ's "Notice of Right to Sue."

## PARTIES

10.     Plaintiff is currently domiciled at 1905 Lake Forest Drive, Upper Marlboro, MD 2077 P.O. Box 432, Simpsonville, Maryland 21150.  Plaintiff is a resident of the State of Maryland and a United States citizen.

11.     Defendant, WMATA, is an instrumentality created by Congress to operate a mass transit system in the District of Columbia and the surrounding Metropolitan area and is subject to suit for the negligent, discriminatory, wanton, willful or wrongful acts and/or omissions of its employees or agents and is therefore liable, pursuant to the doctrine of *Respondeat Superior*.

## FACTUAL BACKGROUND

12.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs, as if fully set forth herein.

13.     At all times relevant to the claims made herein, Plaintiff was a Service Operations Manager (hereinafter "SOM") or Assistant Superintendent at WMATA.

### Promotion to Assistant Superintendent

14.     On or around December 1, 2013, Plaintiff was promoted to Assistant Superintendent and assigned to the Four Mile Run Division (hereinafter "FMTR").

15.     Upon information and belief, seven (7) Assistant Superintendents were hired, consisting of five (5) men and two (2) women.

16.     The male Assistant Superintendents described above include: T. D., A.W., and J.J.

**Unreasonable Performance Standards**

17.     As an Assistant Superintendent, Plaintiff was held to unreasonably high performance standards unique to her and due directly to her gender (female) and/or age (over fifty (40) years).

18.     For example, Plaintiff was wrongfully held accountable for Service Managers (hereinafter "SOMs") allegedly "out sick" during several snow storms, when, in fact, no SOMs called in sick during the times alleged.

     a.  Specifically, several snow storms occurred within a short period of time.  SOMs receive "comp" time for overtime paid during snow storms, during which time SOMs are required to work twelve (12) hour shifts.

     b.  Plaintiff provided large coverage by way of manpower, yet Defendant, by and through management and leadership, denied hotel accommodations for certain SOMs, a practice which has been honored in the past.

19.     Additionally, Plaintiff was accused of creating low morale at FMTR as a direct result of Defendant, by and through management and leadership, selected the SOM's assignments for the first time in Plaintiff's twenty four (24) years of service.

     a.  Due to the assignments made by Defendant, SOMs were required to stand in the elements, without shelter, for eight (8) hours per day for seven (7) days per week.

     b.  In addition, SOMs were paid "straight" time for shuttle services yet were required to work more than forty (40) hours per week.

20.     Director Baker deliberately created conflict between Plaintiff and two (2) other SOMs, C. F. and K.T..

21.     Defendant, by and through Director Baker, complained that Plaintiff emailed business-related matters too often, thus creating a paper trail.  As a result, Director Baker informed Plaintiff that she "cannot trust" her.

22.     Without any such evidence, Director Baker accused Plaintiff of emailing relevant guidelines to other Assistant Superintendents without authorization from the former Superintendent, Darlene Harrington, when, in fact, Plaintiff had acquired such authorization.

23.     Without any evidence, Director Baker accused Plaintiff of authorizing hotel accommodations for SOMs during a snow storm, despite the fact that Assistant Superintendents lack the authorization power necessary to do so.

24.     Upon information and belief, none of the other male Assistant Superintendents were held to the same unreasonably high performance standard due directly to, in some cases, their gender (male), and in other cases, their age (under forty (40) years).

**Demotion as Retaliation**

25.     In or around the end of January 2014, Plaintiff was pulled into a meeting with Superintendent Darlene Harrington (hereinafter "Superintendent Harrington"), Director Baker, and Assistant Superintendent Norman Williams regarding the allegations made above.

26.     After Assistant Superintendent Williams was excused from the meeting, Plaintiff informed Director Baker and Superintendent Harrington that she intended to submit an EEOC claim against them in response to the allegations described above.  In response, Director Baker asked if there was "anything we can do," to which Plaintiff indicated that the harassment perpetrated against her must stop.

27.     At the conclusion of the meeting, and in direct retaliation for Plaintiff's indication of protected activity, Director Baker stated that she would "like all the SOM evaluations to be submitted as soon as possible."

28.     On or around January 27, 2014, before Plaintiff was able to submit her claim to EEOC, Plaintiff met with Superintendent Harrington and Director Baker, who intended to demote Plaintiff.

29.     Immediately thereafter, Plaintiff reached out to Jack Requa, Assistant General Manager, who then referred her to Robert Potts, Managing Director (hereinafter "Director Potts").

30.     On or about January 29, 2014, Plaintiff met with Director Potts to inform him of her situation.  Based upon his response, Director Potts appeared to support the decision of Director Baker and Superintendent Harrington, but indicated he would look into the matter.

31.     However, upon information and belief, Director Potts failed to interview several employees involved in the incidents leading up to the meeting and Plaintiff's ultimate demotion.

32.     Lastly, on or around January 30, 2014, due directly to Plaintiff's participation in protected activity, Defendant, by and through Director Baker, Superintendent Harrington, and Director Potts, demoted Plaintiff based upon unverified statements which garnered no corrective action, training, or discipline.

**Additional Retaliation Following Demotion**

33.     Following her demotion on January 30, 2014, Plaintiff was subjected to further retaliation when she was immediately reassigned to the supervision of Linda Pinkard, Director Baker's personal friend from Bladensburg Division (hereinafter "BLTR").

34.     Plaintiff's reassignment was unusual due to her assignment at FMTR for at least two (2) years, as well as the fact that Ms. Pinkard was influential in providing information to Director Baker to support Plaintiff's demotion.

**Rebuttal and EOER Investigation**

35.     On or around February 3, 2014, Plaintiff submitted a rebuttal memorandum challenging her demotion to the EOER.

36.     As a result, Plaintiff was interviewed by Belinda Press, an Employee Relations Officer, and Romaine Parahoo and Michelle Chapman, Manager of EOER, investigated Plaintiff's rebuttal.

37.     On or about March 13, 2014, Plaintiff received a letter from EOER responding to her complaint, informing her that EOER found no cause for action in her case, and summarily denying her challenge to her demotion.

38.     Again, upon information and belief, EOER's investigation failed to interview the employees involved with the incidents described above.


**Comparable Treatment of Other Assistant Superintendents**

39.     Again, upon information and belief, other Assistant Superintendents in similar positions were treated more favorable due directly to, in some cases, their gender (male), and in other cases, their age (less than fifty (50) years).

40.     For example, upon information and belief, one Assistant Superintendent (gender: Male) received several complaints of Harassment and Unprofessional Behavior: Rude and Discourteous from Bus Operators and SOMs.  Upon information and belief, the Assistant Superintended never received any discipline as a result of the complaints lodged against him.

41.     Additionally, upon information and belief, prior to his promotion, the same Assistant Superintendent (gender: Male) was arrested for the theft of a television while on duty in a company vehicle, yet was still promoted.  Upon information and belief, such information was known by Director Baker and all staff members of the Bus Transportation division with five (5) years of seniority.

42.     Sexual harassment charges were sustained against another Assistant Superintendent (gender: Male), who was merely temporarily relocated to another location but promptly returned back to his position.

43.     Furthermore, another Assistant Superintendent (gender: female; age: under forty (40) years) completed the 2013 vacation selection for all SOMs at least three (3) months late, yet no disciplinary action was administered.  The same Assistant Superintendent made several mistakes on her administration of the shuttle services, yet no disciplinary action was administered.  Lastly, in managing the vacation leave request for all SOMs, she often allowed SOMs leave at the same time, in effect creating zero to very limited coverage, yet no disciplinary action was administered.

44.     Lastly, another Assistant Superintendent (gender: Male) was assigned to Acting Superintended and unilaterally designated SOMs to provide additional support.

**Leave Taken Due to Retaliation**

45.     From in or about March 2014 to April 2014, Plaintiff took leave in order to treat adjustment disorder, acute stress, depression, and anxiety, among other things, she suffered as a direct result of the retaliation against her and ultimate demotion.

46.     In or around April 2014, Plaintiff returned to work in order to participate in a "system pick" work schedule selection based upon seniority and to preserve her position before her ninety (90) days had expired.

### Harassment Upon Return From Leave

47.     Upon Plaintiff's return to work in or around April 2014, she was subjected to continued harassment and retaliation from Defendant, by and through Director Baker and Superintendent Harrington.

48.     For example, following her demotion, Plaintiff was returned to BLTR under the supervision of Ms. Pinkard, who provided supporting information for Plaintiff's demotion and is believed to be a personal friend of Director Baker.   As a result, Plaintiff was forced to work directly with EOER to ensure she was properly returned to FMTR.

49.     In addition, Plaintiff was not offered the opportunity to work "Metro Way," a special assignment that provided early "straight" schedules with weekends off.   Instead, Metro Way was improperly assigned to a younger SOM (age: under forty (40) years) with only three (3) months of seniority and no EEO activity.

50.     Upon information and belief, the four (4) SOMs ultimately assigned to Metro Way were two (2) males and two (2) females, all under forty (40) years old and with very low seniority.   Plaintiff was informed that the other candidates were found to be "better suited for [the] position," despite all having much less seniority and experience than Plaintiff.

51.     Furthermore, upon returning to work, Plaintiff's leave requests were left unanswered for an inordinate amount of time without explanation and any requested schedule adjustments were denied without explanation.

52.     Lastly, as part of her performance evaluation, Plaintiff was given a rating of "Met Objective" after receiving "Exceeds Expectations" on her previous two (2) years of performance evaluations – specifically, 2011 and 2012.

### System Picks as Age Discrimination

53.     Upon information and belief, the FMTR assignment selections for SOMs by Defendant, by and through management and leadership, is designed to provide more favorable shifts (i.e., "straight" schedules and/or no weekends) to SOMs who are male and/or under the age of forty (40) years.

54.     For example, during the third system pick of 2014 on or around July 20, Director Baker directed that all SOMs be assigned shifts.   In Plaintiff's fourteen (14) years of management and twenty four (24) years of service, this was the first system pick in which management made selections for the SOM's shifts.

55.     In response to the directive to provide three (3) assignment choices, Plaintiff provided six (6) choices and was awarded her sixth (6th) selection without explanation.

56.     Plaintiff, upon information and belief, is aware of at least twelve (12) other SOMs over the age of forty (40) who received less favorable shifts as a result of Defendant's sudden commandeering of the July 20, 2014 system pick.

57.     By contrast, Plaintiff, upon information and belief, is aware of at least fourteen (14) SOMs who are under forty (40) years of age and/or males, and who received more favorable shifts as a result of Defendant's control over the July 20, 2014 system pick.

58.     Upon information and belief, the shifts of the remaining twenty one (21) SOMs – fifteen (15) of which were males, and six (6) of which were females over the age of forty (40) years – did not change.

59.     Following the July 20, 2014 system pick, the Accident Investigation Team, discussed below, *infra*, consists nearly exclusively of SOMs who are either male or under forty (40) years old.

## Comparators for Age Discrimination

60.     Upon information and belief, Plaintiff is aware of at least four (4) SOMs who are over the age of forty (40) years and accepted lateral positions in Training due to avoid the differential treatment by Defendant, by and through the corresponding management and leadership.

61.     Further, upon information and belief, Plaintiff is aware of at least five (5) SOMs who are over the age of forty (40) years and accepted lower wage positions in the Rail division to avoid the differential treatment by Defendant, by and through the corresponding management and leadership.

62.     Upon information and belief, Plaintiff is aware of at least four (4) female SOMs who are over the age of forty (40) years and accepted lateral positions in the On-Time Performance Center (hereinafter "OTP").

63.     Moreover, upon information and belief, Plaintiff is aware of at least six (6) SOMs who are over the age of forty (40) years and retired due to Defendant's discriminatory treatment.

64.     Lastly, Director Baker stated directly to Plaintiff and others, on several occasions, that she was "going to get rid of all the old heads" and that she "didn't like working with women."  Upon information and belief, Plaintiff is aware of at least four (4) other female SOMs who witnessed such conversations with Director Baker.

**Preliminary Sexual Advances**

65.     In or around May 2014, Defendant, by and through Plaintiff's supervisor, a male Assistant Superintendent, began making inappropriate statements toward Plaintiff, such as "you know you and [your husband] Greg ain't doing nothing."

66.     The advances discussed herein were, at times, witnessed by other SOMs, including, but not limited to, Nikki Mackall, Keisha Townsend, and Bobby Smoot.

67.     When other SOMs were not present, however, Defendant, by and through Plaintiff's supervisor, would make increasingly inappropriate statements toward Plaintiff, such as "you know you and Greg ain't doing nothing, you ought to give me some."

68.     At times, Plaintiff would simply walk away from her supervisor and respond by showing him his advances were unwelcome, stating "you need to go ahead with that."

**Assignment Opportunity**

69.     In or around June 2014, Plaintiff received a call from Assistant Superintendent James Jackson (hereinafter "Mr. Jackson") offering her an opportunity to join the Accident Investigation Team.  As Plaintiff did not have ample information and was reluctant due to previous experiences, she declined the offer.

70.     Soon thereafter, Plaintiff's supervisor also requested she join the team.  Plaintiff kindly informed her supervisor of her response to Mr. Jackson.   Plaintiff's supervisor then requested that she reconsider and stated that the assignment would be stationed in Virginia.

71.     Plaintiff responded that she would, in fact, reconsider.  During that time, Plaintiff spoke with a few of her colleagues and indicated her reluctance to join the Accident Investigation Team.  She feared that the assignment was a "set-up" for more disciplinary action, not excluding an additional demotion.

72.     In or around June 2014, Plaintiff visited the FMTR Regional Office and found her supervisor present there.  They discussed the assignment to the Accident Investigation Team, that Plaintiff enjoyed conducting accident investigations and that the early straight hours would be comparable to her schedule history.

73.     Plaintiff also expressed her reluctance to accept the assignment, due to her fears that the assignment would be managed under Linda Pinkard and that the unit would be relocated away from FMTR in Virginia.  Plaintiff's supervisor assured her that the assignment would not be managed under Linda Pinkard and that the unit would remain in Virginia.

74.     Plaintiff ultimately indicated she would accept the assignment, despite the fact that the position would require her to work in the South East corridor of Washington, D.C.

**Sexual Advances In Exchange for Guarantee**

75.     During the conversation, Plaintiff's supervisor instructed her to "trust him" and "don't say anything to anybody," and asked if Plaintiff could "keep a secret."  Plaintiff agreed not to say anything, as she felt that upper management blocks most of her advancement opportunities and it may be different this time with her supervisor handling the assignment.

76.     Plaintiff's supervisor then asked her if she could "keep a secret from [her] husband" and "give [him] some of that," making a pointing gesture at Plaintiff's vagina, and stating "I will make sure you get that assignment, trust me."

77.     Plaintiff verbally denied her supervisor's advances and physically walked away. As Plaintiff was walking away from her supervisor, he stated, "okay, you want that assignment?"

78.     Furthermore, during conversations between Plaintiff and her supervisor outside of the presence of other SOMs, Plaintiff's supervisor would sometimes put his hand on Plaintiff's knee.  In response, Plaintiff would tell him to "leave [her] alone."

### Consequences for Denying Sexual Advances

79.     As a direct result of Plaintiff's unequivocal denial of her supervisor's sexual advances, she did not receive the Accident Investigation Team assignment.

80.     Additionally, Plaintiff's supervisor's attitude and behavior toward her changed significantly following Plaintiff's rebuffing of his advances.

81.     For example, Plaintiff's supervisor began using strong and demeaning tones when speaking with her, especially when in front of other SOMs.

82.     Furthermore, Plaintiff's supervisor began nitpicking two of her citations, indicating that Plaintiff is required to "print" her citations not "write" them.  Plaintiff checked the accuracy of this instruction with Linda Pinkard, who indicated that it is not necessary to print citations.

83.     Plaintiff's supervisor also allowed Nikki Mackall and Alva Kelly to assist with the July 20, 2014 system pick, despite Plaintiff assisting with all other previous system picks.

### Failure to Report Due to Fear of Retaliation

84.     Following the incidents detailed above, Plaintiff refused to report the incidents and continued working out of fear of additional retaliation, harassment, falsified statements, and wrongful disciplinary action.

85.     In or about July 2014, Devin Walker, Consulting EEO and Employee Relations Officer (hereinafter "Mr. Walker"), met with Plaintiff in regards to an investigation involving Arlancia Williams, another plaintiff SOM who had filed a complaint of sexual harassment against Plaintiff's supervisor.

86.     Mr. Walker asked Plaintiff several questions, including whether Plaintiff has witnessed her supervisor sexually harass anyone.  Plaintiff informed Mr. Walker that she had "a

lot of information," but, as a result of her fears and a previous unrelated incident with Equal Opportunity Employee Relations (hereinafter "EOER"), she was reluctant to discuss them with him.  Due to Plaintiff's emotional condition, Plaintiff did not share her concerns with Mr. Walker, and the meeting ended without resolution.

### Decision to Report After Condition Worsened

87.     Over the next few weeks, in or around late July and early August 2014, Plaintiff battled with her past and present experiences, including sexual harassment by her supervisor, Dana Baker's age and gender discrimination, and harassment and retaliation from Darlene Harrington and Dana Baker.

88.     As a result, Plaintiff's anxiety, stress, and depression were magnified to unhealthy levels.

89.     On or around August 14, 2014, due to the mounting strain on Plaintiff's mental health, she decided to meet with Mr. Walker and inform him of the sexual harassment perpetrated by her supervisor.

90.     Due to Plaintiff's emotional condition and the form of Mr. Walker's leading questions, Mr. Walker allowed Plaintiff to send him a clearer statement and additional information to assist him in his investigation.

91.     The following day, on or around August 15, 2014, Plaintiff sent Mr. Walker a formal complaint detailing her claims of discrimination and sexual harassment against her supervisor.

92.     Due to Plaintiff's distrust of Mr. Walker and the multiple sexual harassment complaints pending against her supervisor, Plaintiff was soon thereafter informed that Beverly Pollard would be handling her case.

93.     As a result, Plaintiff was re-interviewed on or around September 16, 2014, and Plaintiff also provided a follow-up email on or around September 20, 2014.

## Sexual Harassment Investigation

94.     On or around October 21, 2014, Plaintiff received a notification that the Agency had completed its investigation of her complaint against her supervisor.

95.     In its letter, the Agency indicated that, in Plaintiff's supervisor's interview with the OEEO, he denied ever sexually harassing Plaintiff, touching her knee at any time, discussing sex with her, or promising her an assignment on the Accident Investigation Team.

96.     The Agency also claimed there were no witnesses to substantiate her allegations of quid pro quo sexual harassment by Plaintiff's supervisor.

97.     The Agency supported its decision by indicating that Plaintiff's supervisor never had the power to give her the Accident Investigation Team position, because it was a shared decision among all of the Assistant Superintendents, and that Plaintiff simply did not receive as many votes as those were selected for the position.

98.     Ultimately, the Agency found no probable cause for Plaintiff's formal complaint of sexual harassment and gender discrimination against her supervisor.

## WMATA Awareness of Plaintiff's Supervisor's History

99.     Pursuant to Plaintiff's information and belief, WMATA is aware that Plaintiff's supervisor has previously been found guilty on sexual harassment charges by WMATA, has, upon information and belief had several sexual harassment claims lodged against him at the D.C. Police Department, and a more detailed history regarding issues with women.

100.    Additional female victims of Plaintiff's supervisor existed at WMATA, including S.Y., N. M., K. Larry, S.S., C.F, and A.W.   However, due to abject fear of retaliation, many victim's official complaints were either dropped or failed to be submitted.

101.    One victim in particular, C.F, submitted a claim to Beverly Pollard and the EEOC regarding harassment by Plaintiff's supervisor, but Ms. F ultimately dropped her claim following Ms. Pollard allegedly informing her that it was not viable.

**COUNT ONE**
**Sexual Harassment**
42 U.S.C. § 2000e-2(a)(1)
(*Quid Pro Quo*)

102.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

103.    Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

104.    At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

105.    Plaintiff is a member of a protected class, as she is a female.

106.    Defendant, by and through their agents, made unwelcome and unwanted sexual advances and sexual comments to Plaintiff because of her sex.

107.    Defendants conditioned Plaintiff's receipt of job benefits on their acquiescence to those sexual advances.   When Plaintiff refused to acquiesce, demonstrating that such advances and comments were unwelcome, she suffered tangible adverse employment actions.

108.    Defendant and Defendants' agents were acting within the scope of their employment when they sexually harassed Plaintiff.

109.    The unwelcome sexual advances made by supervisors, Defendants and their agents toward Plaintiff constitute sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

110.    Defendants' conduct constitutes sex discrimination in violation of Plaintiffs' right to equal protection under the Fifth Amendment to the United States Constitution.

111.    Defendants had notice and knowledge of unlawful conduct by Defendants and, through their failure to remedy and prevent such violations of law, have established ongoing and pervasive sexual harassment as the custom and policy of the Agency.

112.    Defendants had notice and knowledge of unlawful conduct by Defendants and, through their failure to remedy and prevent such violations of law, have demonstrated deliberate indifference to the risk that such activity would result in constitutional violations.

113.    Defendants, implicitly or explicitly, with intent and knowledge of the foreseeable consequences, condoned, authorized, or ratified the conduct of their agents, promoted or permitted a working environment where such conduct was tolerated, condoned or encouraged, and systematically violated their own purported policies prohibiting sexual harassment in the workplace.  Such actions were taken by or with the knowledge of the Director of the Department. Defendants and their agents have been deliberately indifferent to the unlawful and unconstitutional activity that occurs at the Agency.

114.    Due to Defendant's actions, Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering and such impact is on-going and permanent in nature.

115.    Plaintiff has incurred lost wages and loss of career opportunity, now and into the future, without Plaintiff contributing any negligence thereto.

## COUNT TWO
### Sexual Harassment
42 U.S.C. § 2000e-2(a)(1)
(*Hostile Work Environment*)

116.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

117.    Plaintiff has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

118.    Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

119.    At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

120.    Plaintiff is a member of a protected class, as she is a female.

121.    Defendant discriminated against Plaintiff because of her gender in violation of Title VII, 42 U.S.C. § 2000e-(2)(a), by engaging in, tolerating or failing to prevent the gender-based harassment alleged herein and by failing to take affirmative action to correct and redress these unlawful employment practices.

122.    During her employment, Plaintiff's supervisor subjected her to a barrage of offensive and unwelcome comments.   Plaintiff clearly indicated that the conduct was unwelcome.  Plaintiff did not solicit or incite the conduct and she perceived the conduct to be offensive and/or undesirable.

123.    This conduct and other incidents of harassment described above were because of Plaintiff's gender.

124.    The conduct suffered by Plaintiff was sufficiently pervasive and/or severe to alter and did alter a condition of Plaintiff's employment and created an abusive working environment.

125.    Plaintiff was detrimentally affected by the conduct and such conduct would have detrimentally affected a reasonable woman in Plaintiff's position.

126.    The Defendant knew or should have known of the harassment described herein and Plaintiff's supervisor's propensity to engage in such gender-based harassment and failed to implement effective, immediate or remedial action.

127.    The harassment directed at Plaintiff was either intended to cause her severe emotional distress or was perpetrated with malice or reckless indifference to the likelihood that it would cause such distress. Defendant is, therefore, liable to Plaintiff for all damages proximately resulting from the distress she has suffered relating to the conduct of Defendant.

128.    By failing to take appropriated and effective remedial action against Mr. Montague, Defendant acted with malice or with reckless or callous indifference to Plaintiff's complaints.

129.    As a direct and proximate cause of Defendant's conduct, Plaintiff suffered substantial damages, including, but not limited to, loss of income, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses.

130.    Due to Defendant's actions, Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering and such impact is on-going and permanent in nature.

131.    Plaintiff has incurred lost wages and loss of career opportunity, now and into the future, without Plaintiff contributing any negligence thereto.

## COUNT THREE
### Gender Discrimination
42 U.S.C. § 2000e-2(a)(1)
(*Female*)

132.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

133.     Plaintiff has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

134.     Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

135.     At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

136.     Plaintiff is a member of a protected class, as she is a female.

137.     Defendant discriminated against Plaintiff because of her gender in violation of Title VII, 42 U.S.C. § 2000e-(2)(a), by engaging in, tolerating or failing to prevent the gender-based harassment alleged herein and by failing to take affirmative action to correct and redress these unlawful employment practices.

138.     During her employment, Plaintiff was consistently marginalized by Defendant, by and through the actions of Director Baker and Superintendent Harrington, where Plaintiff received unfavorable selections in the system picks discussed above, as well as treated unfavorably as compared with male SOMs and Assistant Superintendents.

139.     Furthermore, during her employment, Plaintiff's supervisor subjected her to a barrage of offensive and unwelcome comments.  Plaintiff clearly indicated that the conduct was unwelcome.  Plaintiff did not solicit or incite the conduct and she perceived the conduct to be offensive and/or undesirable.

21

140.     This conduct and other incidents of harassment described above were because of Plaintiff's gender.

141.     The harassment directed at Plaintiff was either intended to cause her severe emotional distress or was perpetrated with malice or reckless indifference to the likelihood that it would cause such distress. Defendant is, therefore, liable to Plaintiff for all damages proximately resulting from the distress she has suffered relating to the conduct of Defendant.

142.     Due to Defendant's actions, Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering and such impact is on-going and permanent in nature.

143.     Plaintiff has incurred lost wages and loss of career opportunity, now and into the future, without Plaintiff contributing any negligence thereto.

## COUNT FOUR
### Age Discrimination
29 U.S.C. § 623(a)(1)
*(over forty (40) years of age)*

144.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

145.     Plaintiff has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

146.     Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

147.     At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

148.     Plaintiff is a member of a protected class, as she is over forty (40) years of age.

149.     Defendant discriminated against Plaintiff because of her age in violation of the Age Discrimination in Employment Act of 1967, codified at 29 U.S.C. § 623, *et seq.*, by engaging in, tolerating or failing to prevent the age-based harassment alleged herein and by failing to take affirmative action to correct and redress these unlawful employment practices.

150.     During her employment, Plaintiff was consistently marginalized by Defendant, by and through the actions of Director Baker and Superintendent Harrington, where Plaintiff received unfavorable selections in the system picks discussed above, as well as treated unfavorably as compared with younger SOMs and Assistant Superintendents under age forty (40).

151.     This conduct and other incidents of harassment described above were because of Plaintiff's age.

152.     The harassment directed at Plaintiff was either intended to cause her severe emotional distress or was perpetrated with malice or reckless indifference to the likelihood that it would cause such distress. Defendant is, therefore, liable to Plaintiff for all damages proximately resulting from the distress she has suffered relating to the conduct of Defendant.

153.     Due to Defendant's actions, Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering and such impact is on-going and permanent in nature.

154.     Plaintiff has incurred lost wages and loss of career opportunity, now and into the future, without Plaintiff contributing any negligence thereto.

## COUNT FIVE
## Retaliation Based Upon Protected Activity
42 U.S.C. § 2000e-2(a)(1)

155.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

156.    Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

157.    At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

158.    Plaintiff has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

159.    Plaintiff complained verbally and in writing to WMATA management and officials regarding her belief that she was being subjected to sexual harassment and discriminatory conduct based upon her gender and age.

160.    Plaintiff filed a complaint with WMATA's EOER regarding her claims of discrimination based upon gender and age, as well as retaliation for her participation in protected activity.

161.    Defendant subjected Plaintiff to the aforementioned adverse employment actions because of her participation and opposition to unlawful and discriminatory employment practices in violation of Title VII, Section 1983.

162.    The adverse retaliatory actions to which Plaintiff has been subjected are a direct result of Plaintiff having previously engaged in protected EEO activity.

163.    Similarly situated employees (no known prior EEO activity) were not subjected to the same, similar, or any other adverse treatment.

164.    Other employees who were similarly situated, but members of a different protected class than Plaintiff, have received different terms and conditions of employment.

165.    Defendant's unlawful conduct has created a climate of fear and intimidation for Plaintiff and other employees, which creates a chilling effect upon other employees' willingness to engage in protected activity.

166.    Defendant's unlawful conduct negatively impacted the terms, conditions, and privileges of Plaintiff's employment.

167.    Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her participation and opposition to Defendant's discriminatory conduct.

168.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior.*

169.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

170.    Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering.

171.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity, now and into the future, without Plaintiff contributing any negligence thereto.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

a. Order the Defendant to reassign Plaintiff to a new position with new first-line supervision;

b. Order the Defendant institute a policy and procedure to be implemented against discrimination;

c. Equal Employment Opportunity training for Defendant and the supervisory officials at issue herein;

d. Supervisory training for the supervisors at issue herein; and

e. Award compensatory damages in excess of Two Hundred Thousand Dollars ($200,000.00);

f. Award medical costs and expenses incurred as a result of Defendant's unlawful conduct;

g. Award lost wages;

h. Award back pay and benefits, with interest;

i. Award future wages;

j. Award reasonable attorney fees, costs, and expenses incurred for this action;

k. Award equitable, declaratory, and injunctive relief; and

l. Award such other and further relief as this Honorable Court deems just and proper.

### Equitable Relief

172. Plaintiff hereby incorporates, by reference hereto, the facts, law, and/or allegations contained within the preceding paragraphs, as fully set forth herein.

173.    Because of the actions alleged herein, the continued employment of the

supervisors at issue herein without training in equal employment opportunity law,

rules and regulations, clear and present dangers to the employees of Defendant and

could result in further illegal actions on the party of Defendant, by and through its

agents, servants, and employees.

## **JURY DEMAND**

174.    Pursuant to Fed. R. Civ. P. 38, Plaintiff demands trial by jury on all issues so

triable.

October 24, 2016                                    Respectfully submitted,


By:     /s/ *Donna Williams Rucker*_____
            Donna Williams Rucker (D.C. Bar 446713)

            Tully Rinckey, PLLC
            815 Connecticut Ave., N.W.,
            Suite 720
            Washington, DC 20006
            (202) 787-1900
            DRucker@fedattorney.com

            *Counsel for Plaintiff Terri Norris*