# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| TERRI NORRIS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 16-cv-02120 (RC) |
| | : | | |
| v. | : | Re Document No.: | 17 |
| | : | | |
| WASHINGTON METROPOLITAN AREA | : | | |
| TRANSIT AUTHORITY, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Terri Norris, an employee of Defendant Washington Metropolitan Area Transit Authority ("WMATA"), brought this action alleging quid pro quo sexual harassment, hostile work environment, gender discrimination, age discrimination, and retaliation in October 2016. After Norris's age discrimination claim was dismissed in February 2017, WMATA now moves for summary judgment on the four remaining claims. Having reviewed the parties' filings, the Court grants in part and denies in part WMATA's motion for summary judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff Terri Norris is a fifty-four-year-old African-American female, *see* Compl. ¶ 6, ECF No. 1; July 25, 2014 EEOC Intake Questionnaire 1, Pl.'s Ex. 2, ECF No. 19, who was

---

[1] In ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Accordingly, where facts are disputed, the Court will view the evidence in the light most favorable to Norris.

employed by Defendant WMATA at all times relevant to the claims in the complaint, *see* Compl. ¶ 13; Answer ¶ 13, ECF No. 7. WMATA is a transit authority created by interstate compact among the District of Columbia, Virginia, and Maryland to provide mass transit in the Washington, D.C. metropolitan area. *See* Compl. ¶ 11; Answer ¶ 11. In connection with its mission, WMATA operates an extensive bus service system that provides half a million rides every weekday to customers in the Washington, D.C. metropolitan area. *See* WMATA Position Statement 2, Def.'s Ex. 8, ECF No. 17. WMATA employs Service Operations Managers ("SOMs") in different geographic regions in the Washington, D.C. service area to oversee and provide direction to its 2,500 bus operators. *See id.* The service area is divided into four principal regions, including, as relevant to this suit, the Four Mile Region, which covers routes serving Virginia and the Shepherd Parkway area of Southeast D.C. *See id.* Norris joined WMATA in 1990 and became a SOM between 2000 and 2001. *See* Norris Dep. 9:1–9:12, Pl.'s Ex. 1, ECF No. 19.

### A. December 2013 Promotion and January 2014 Demotion

On December 1, 2013, Norris was promoted from SOM to Assistant Superintendent of Street Operations, with a six-month probationary period. *See* Pl.'s Statement of Facts ¶ 18, ECF No. 19. As Assistant Superintendent, Norris was in charge of ensuring SOMs performed their duties, handling administrative and HR requests or issues concerning SOMs, responding to accidents, and overseeing departments in the Bus Operation Control Center. *See* Norris Dep. 12:18–13:12. She was assigned to the Four Mile Division and typically oversaw between 20 and 25 SOMs on her daily shift. *See id.* at 13:15–14:4.

As an Assistant Superintendent, Norris's supervisors were Darlene Harrington, the Superintendent of Street Operations, *see* Pl.'s Statement of Facts ¶ 6; Norris Dep. 38:10–38:15,

and Dana Baker, the Director, Operations Control Center of Bus Transportation, Pl.'s Statement of Facts ¶ 3; Walker Dep. 43:9–44:6, Pl.'s Ex. 3, ECF No. 19.  Like Norris, both Harrington and Baker are African-American females.  *See* Pl.'s Statement of Facts ¶¶ 2, 5.  Norris sought approval from Harrington, sometimes copying Baker, for a variety of communications to SOMs during her time as Assistant Superintendent.  *See* Norris SOM Communications, Pl.'s Ex. 6, ECF No. 19.  On one occasion, Norris was told by Baker that she was "documenting[,]" when Baker needed "somebody [she] [could] trust."  Norris Dep. 76:16–77:13.  Baker told Norris on another occasion that she did not like working with women, *see* Norris Decl. ¶ 11, Pl.'s Ex. 19, ECF No. 19, and another WMATA employee who worked with Baker when she was Director also heard her state on multiple occasions that she did not like working with women, *see* Collins Sr. Decl. ¶ 2, Pl.'s Ex. 18, ECF No. 19.

Between December 2013 and January 2014, Norris was the subject of a formal harassment complaint by a SOM, Sharron Young.  *See* Norris Dep. 26:21–27:13.  Young's complaint was eventually dismissed after WMATA investigated her claims.  *See* Suppl. Norris Dep. 28:16–29:10, Pl.'s Ex. 1, ECF No. 21.  Norris had a difficult relationship with two other SOMs, *see id.* at 36:2–36:14, 38:19–39:3, including Claire Fenelus, a SOM who ultimately took part in a meeting with Norris, Harrington, and Baker on January 11, 2014 to resolve her issues with Norris, *see id.* at 37:1–37:17, 84:5–84:9; Fenelus Letter, Pl.'s Ex. 7, ECF No. 19.  It is unclear whether Fenelus's issues were actually resolved at the meeting.  *Compare* WMATA Demotion Memo. 1, Pl.'s Ex. 10, ECF No. 19, *with* Fenelus Letter.  Norris also made her own complaints of harassment against Baker and Harrington, first to Harrington and another WMATA employee, Romaino Parahoo, on or around January 14, 2014, and then directly to both Baker and Harrington at a January 27, 2014 meeting.  *See* Norris Decl. ¶ 12–13.  At the meeting,

Norris informed Baker and Harrington that she planned to file a harassment complaint with the EEOC. *See id.* at ¶ 13.

On January 30, 2014, three days after the January 27 meeting and two months after her promotion, Norris was demoted back to SOM. *See* Pl.'s Statement of Facts ¶ 19. Norris attended a meeting with Harrington, Baker, and another WMATA employee, Ray Alfred, where Harrington read to Norris a demotion memorandum stating the reasons for her demotion. *See* Def.'s Resps. To Pl.'s Interrogs. ¶ 13, Pl.'s Ex. 11, ECF No. 19. The memorandum, addressed from Harrington to Norris and copying Baker, listed multiple issues with Norris's behavior that had allegedly led to her demotion: first, Norris had been repeatedly communicating with staff without first clearing the communications with Harrington, despite Harrington giving Norris a verbal warning on the issue following a December 2, 2013 communication; second, two complaints of harassment had been filed by two separate SOMs against Norris in the past few weeks; third, Norris had provided verbal approval to cover expenses for overnight hotel accommodations for six SOMs on January 21, 2014 without first obtaining authorization; and finally fourth, Norris had been involved in a "hostile, overly argumentative, and inappropriate conversation with Linda Pinkard, Assistant Superintendent of Street Operations[,] . . ." on January 22, 2014. *See* Demotion Memo., Pl.'s Ex. 10, ECF No. 19. Following her demotion, Norris went on leave around March 2014 and resumed working as a SOM around April 2014. *See* Norris Decl. ¶ 19–20.

### B. July 2014 Assignment Selection

Prior to 2013, SOMs had been selecting their work assignments and shifts at WMATA based on seniority, in a process known as "the pick[.]" Baker Aff. ¶ 10, Def.'s Ex. 1, ECF No. 17. Baker eliminated the pick in June 2013, and between June 2013 and July 2014 SOMs were

assigned to shifts and assignments based on their skills, experience, and on WMATA's operational needs.[2] *See* Pl's Statement of Facts ¶ 8–9. During that time, Assistant Superintendents worked together with the Superintendent of Bus Services to identify and recommend work assignments for each SOM. *See id.* ¶ 10. Baker had final say as to the assignments. *See id.* Starting in July 2014, SOMs were allowed to submit their preferred work assignment choices for consideration by WMATA as part of the work assignment process. *See id.* ¶ 11.

Because she had been demoted back to a SOM in January 2014, Norris participated in the July 2014 work assignment process and submitted her work assignment preferences for consideration. *See id.* ¶ 12. Norris submitted six choices for consideration. *See id.* She indicated on her work selection form that "if possible, [she] would like to remain at FMTR Region[,]" and only selected assignments located in the Four Mile Region, Work Selection Choices, Pl.'s Ex. 13, ECF No. 19, in order to avoid working in another region under the supervision of one of Baker's friends at WMATA, *see* Norris Decl. ¶ 22. Of the six work assignment preferences, at least four involved "early straight" schedules, starting in the early morning and ending in the early afternoon every day. *See* Work Selection Choices; Pl.'s Work Assignment Sheet, Pl.'s Ex. 15, ECF No. 19.[3] Norris prefers an early straight schedule and the

---

[2] Norris disputes this timeline but refers to a July **2014** e-mail to refute the proposition that WMATA assigned SOMs to positions based on skills, experience, and operational needs in June 2013. *See* July 14, 2014 Pinkard E-Mail, Pl.'s Ex. 2., ECF No. 21. The e-mail does not contradict the timeline proposed by WMATA and instead is consistent with it, given the July 2014 change in the work assignment method acknowledged by WMATA. *See id.*

[3] Norris contends that the Metro Way assignment she was interested in had an early-straight schedule. *See* Norris Decl. ¶ 20. However, the Metro Way assignment she selected in her work assignment form appears to have been an afternoon shift. *See* Work Selection Choices; Pl.'s Work Assignment Sheet.

majority of her shifts in the latter part of her career have been early straights. *See* Norris Dep. 14:5–14:22.

Norris received her sixth preferred choice in the July 2014 work assignment, a "swing shift" from 6:00 AM to 10:00 AM and 03:00 PM to 07:00 PM daily. *See* Work Selection Choices; Pl.'s Work Assignment Sheet. The work assignment was located in the Four Mile Region. *See* Pl.'s Work Assignment Sheet.

### C. Non-Selection to Metro Way

One of the assignments Norris expressed an interest in as part of the July 2014 work assignment process was Metro Way. *See* Norris Decl. ¶ 20; Work Selection Choices; Pl.'s Work Assignment Sheet. Metro Way was a new type of bus service operating exclusive routes between Alexandria and Arlington, VA, developed by Assistant Superintendent William Proctor in conjunction with WMATA's Planning Department and Virginia transportation officials. *See* WMATA Position Statement at 7. Metro Way offered early straight shifts. *See* Pl.'s Work Assignment Sheet.

Norris was not given a Metro Way assignment, despite selecting a Metro Way route as her second choice on her work selection form. *See* Work Selection Choices; Pl.'s Work Assignment Sheet. She reached out to Harrington after assignments were given out to ask "[w]hy . . . Metro Way [was] not offered to [her][.]" July 29, 2018 Harrington E-mail, Pl.'s Ex. 16, ECF No. 19. Harrington replied on July 29, 2014 that she was not selected for the position because "[o]ther candidate(s) were found to be better suited[.]" *See id.* The Metro Way assignment went to two men and two women, all of whom had significantly less experience as SOMs than Norris. *See* Pl.'s Work Assignment Sheet; October 20, 2014 Pick Spreadsheet, Pl.'s Ex. 12, ECF No. 19.

### D. Non-Selection to the Accident Investigation Team

Another assignment Norris sought to obtain in July 2014 was a slot on WMATA's Accident Investigation Team ("AIT"), a newly created unit where SOMs would exclusively focus on investigating accidents across all regions in which WMATA operated. *See* Walker Dep. 124:13–125:1; Pl.'s Statement of Facts ¶ 14. The AIT assignment process operated similarly to others in that Assistant Superintendents and the Superintendent made recommendations to Baker, who had ultimate say over the assignments. *See* Pl.'s Statement of Facts ¶ 14–15. However, SOMs did not have the opportunity to elect a preference for the assignment on their work selection form. *See* Norris Dep. 135:1–135:13. Rather, Norris was first told that she was qualified to join the AIT in June 2014. *See* August 14, 2014 WMATA Formal Discrimination Complaint, Def.'s Ex. 5, ECF No. 17; June 26, 2014 Pinkard E-mail, Pl.'s Ex. 14, Ex. 19. On June 26, Norris was included in an e-mail to 17 SOMs informing them that they had "been identified by [their] Asst. Supt. has [sic] a candidate for the New Accident Investigation Team[.]" *See* June 26, 2014 Pinkard E-mail.

Shortly after she learned about the AIT opportunity, Norris had a conversation about the assignment with Assistant Superintendent Alphonso Walton. *See* Norris Decl. ¶ 26. Walton was Norris's supervisor, prepared her 2014 evaluation plan, and conducted her mid-year evaluation. *See id.*; Norris 2014 Performance Management Form 3, Pl.'s Ex. 17, ECF No. 19. It is alleged that Walton was also a known sexual harasser in the office, *see* Walker Dep. 166:4–166:19; Sept. 16, 2014 EEOC Charge, Def.'s Ex. 7, ECF No. 17, who regularly made inappropriate and sexually explicit comments when talking to Norris, *see* Sept. 16, 2014 EEOC Charge, and who was at some point disciplined for sexually harassing another WMATA employee, *see* Walker Dep. 108:15–109:4. During the conversation between Norris and Walton, Norris alleges that

Walton told her to "trust him" and asked if she could "keep a secret from [her] husband[.]" Norris Decl. ¶ 27; *see also* Sept. 16, 2014 EEOC Charge. Norris further alleges that Walton pointed to her vagina and asked her to "give [him] some of that[,]" stating that he would "make sure you get that assignment[.]" Norris Decl. ¶ 27; *see also* Sept. 16, 2014 EEOC Charge. Norris refused his advances. *See* Norris Decl. ¶ 27.

Norris was ultimately not selected for the AIT. When she reached out to Harrington in July to ask about the Metro Way assignment, she also asked "why . . . the accident investigation team [was] offered to me by Mr. Walton and Ms. Pinkard then retrieved by Mr. Walton[.]" July 29, 2014 Harrington E-mail. Harrington replied: "[b]ased on your comment given to Mr. Walton your preference was to remain in Virginia, therefore you were granted your pervious [sic] assignment." *Id.*

### E. July 2014 EEOC Intake Questionnaire

On July 25, 2014, Norris complained about discrimination she allegedly suffered at WMATA. As part of that process, Norris filled out an intake questionnaire with the EEOC. *See* July 25, 2014 Intake Questionnaire at 1. On the portion of the questionnaire asking the basis for her claim of employment discrimination, Norris checked the boxes for race, age, and discrimination, but circled the box for sex. *See id.* at 2. She checked a box on the last page indicating that she wanted to file a charge of discrimination. *See id.* at 4.

In an attachment filed a few days later on July 29, 2014, Norris indicated, *inter alia*, that she was "demoted without training, corrective action, disciplinary action, written notification or a thorough investigation." *Id.* at 5. She pointed out that "through out [sic] [her] career [she] ha[d] been informed that [she was] different in reference to [her] afrocentric style" and that "Dana Baker never wanted [her] to be hired, therefore used false information for [sic] demotion."

*Id.* She also suggested that "[w]orking a shift at another division could possibility [sic] result in retaliation since I was demoted on January 27, 2014, after working as an Assistant Superintendent for 7 weeks." *Id.* at 6.

After discussing potential age discrimination in the failure to assign her to Metro Way, Norris noted in the penultimate paragraph of the attachment: "in addition to this age discrimination, I also experienced sexual harassment but I refused to support the claim at this time because victims of sexual harassment are victimized[.]" *Id.* at 7. Norris did not otherwise mention sexual harassment in the attachment. *See id.*

### F. Procedural History

On September 16, 2014, Norris filed an official charge of discrimination with the EEOC, alleging discrimination on the basis of age and sex as well as retaliation. *See* September 16, 2014 EEOC Charge. She filed her complaint with this Court on October 24, 2016, alleging quid pro quo sexual harassment, hostile work environment, gender discrimination, age discrimination, and retaliation. *See* Compl. ¶¶ 102–71. After WMATA moved to dismiss the age discrimination claim for lack of jurisdiction and Norris consented, the Court dismissed the age discrimination claim on February 6, 2017. *See* February 6, 2017 Minute Order; Def.'s Mot. Dismiss, ECF No. 3; Pl. Notice to Court, ECF No. 5. WMATA filed its answer on February 22, 2017, s*ee* Answer, and the parties began discovery.

On December 8, 2017, WMATA moved for summary judgment on all remaining claims. *See* Def.'s Mot. Summ. J., ECF No. 17. On January 23, 2018, Norris filed her opposition to the motion, contesting summary judgment on all claims. *See* Pl.'s Mem. Opp'n Summ. J., ECF No. 19. WMATA submitted its reply on February 6, 2018. *See* Def.'s Reply to Opp'n, ECF No. 20.

### III. LEGAL STANDARDS

#### A. Motion for Summary Judgment

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

#### B. Title VII Employment Discrimination

Title VII of the Civil Rights Act makes it unlawful for an employer to discriminate against its employees on the basis of race, color, religion, sex, or national origin, 42 U.S.C. §

2000e–2(a), and prohibits employers from retaliating against an employee who has "opposed any practice made an unlawful employment practice by[,]" or otherwise "made a charge" under, Title VII, *id.* § 2000e–3(a). To prevail on an employment discrimination claim, a plaintiff must show that she suffered an adverse employment action because of her race, color, religion, sex, or national origin. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). To prevail on an unlawful retaliation claim, a plaintiff must establish that she made a charge or opposed a practice made unlawful by Title VII, that the employer took a materially adverse action against her, and that the employer took the action because of the protected conduct. *See Holcomb v. Powell*, 433 F.3d 889, 901–02 (D.C. Cir. 2006).

Direct evidence of discrimination usually entitles the plaintiff to a jury trial. *Vatel v. All. of Auto Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). If there is no direct evidence of discrimination, Title VII claims are assessed under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See id.* The burden then shifts to the employer to provide a "legitimate, non-discriminatory reason" for the adverse employment action. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (citations omitted). If the employer can make such a showing, the burden shifts back to the plaintiff to show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Once an employer has asserted a legitimate, non-discriminatory reason for an adverse employment action under the *McDonnell Douglas* framework, the D.C. Circuit has emphasized that the inquiry into the *prima* facie *case* becomes "an unnecessary and improper 'sideshow.'"

*Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)). Courts instead "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ?" *Brady*, 520 F.3d at 494. In answering this question, courts should consider "all the evidence, including '(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).'" *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 992–93 (D.C. Cir. 2002)).

## IV. ANALYSIS

WMATA moves for summary judgment on all of Norris's remaining claims. The Court first addresses Norris's claims for A. gender discrimination, followed by B. retaliation, C. quid pro quo sexual harassment, and finally D. hostile work environment. For reasons discussed below, the Court partially grants the motion. WMATA's motion for summary judgment is granted as to gender discrimination and granted as to retaliation with the exception of the January 2014 demotion and the July 2014 failure to assign to Metro Way. The motion for summary judgment is denied as to retaliation based on the January 2014 demotion and July 2014 failure to assign to Metro Way, quid pro quo sexual harassment, and hostile work environment.

### A. Gender Discrimination

WMATA contends that Norris cannot prevail on her gender discrimination claim, either based on her demotion on January 30, 2014 or on her shift and schedule change in July 2014.

Norris argues that there are sufficient disputed facts to support a gender discrimination claim as to both 1) the January 30, 2014 demotion and 2) the failure to assign her to Metro Way or the AIT. The Court addresses each argument in turn, and grants WMATA's motion for summary judgment in its entirety as to the gender discrimination claim.

### 1. January 30, 2014 Demotion

First, with respect to Norris's demotion from the Assistant Superintendent position on January 30, 2014, the parties dispute whether Norris has exhausted her administrative remedies by filing a gender discrimination charge with the EEOC within the 180 days required by Title VII, 42 U.S.C. § 2000e–5(e)(1). WMATA also provides a legitimate, non-discriminatory reason for the demotion that Norris argues is pretextual. Because the Court finds that Norris has not exhausted her administrative remedies, it does not address the reasons for Norris's demotion.

Before challenging an unlawful employment practice under Title VII in court, a plaintiff must first file a charge with the EEOC "within a specified period (either 180 or 300 days, depending on the State) 'after the alleged unlawful employment practice occurred[.]'" *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 623–24 (2007) (quoting 42 U.S.C. § 2000e–5(f)(1)), *superseded by statute on other grounds*, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111–2, 123 Stat. 5 (2009). The parties agree that the applicable period here is 180 days.[4]

---

[4] An EEOC charge must typically be filed within 300 days of the alleged discrimination in the District of Columbia, because a work-sharing agreement between the EEOC and the D.C. Office of Human Rights triggers the 300-day exception to the 180-day rule under 42 U.S.C. § 2000e–5(e)(1). *See Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 568–69 n. 13 (D.C. 2007). However, as an interstate compact, courts have found that WMATA was conferred sovereign immunity by Virginia, Maryland, and the District of Columbia, and thus that it is not subject to the D.C. Human Rights Act. *See, e.g.*, *Thompson v. WMATA*, No. 01-7026, 2001 WL 1154420, at *1 (D.C. Cir. Aug. 9, 2001). The exception in 42 U.S.C. § 2000e–5(e)(1) therefore does not apply and the appropriate period for filing an EEOC charge against WMATA is 180 days.

In its motion, WMATA argues that Norris failed to exhaust her administrative remedies because she was demoted on January 30, 2014, had until July 30, 2014 to file an EEOC charge, and did not do so until September 16, 2014. *See* Def.'s Mem. Supp. at 8. Norris retorts that she filed an EEOC Intake Questionnaire on July 25, 2014, which was sufficient to exhaust her administrative remedies. *See* Pl.'s Mem. Opp'n at 23–24. Courts have recognized that the filing of an intake questionnaire with the EEOC can qualify as a "charge" under Title VII. *See, e.g.*, *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) (finding EEOC intake questionnaire to qualify as an EEOC "charge" in the context of administrative exhaustion for ADEA claim); *Tucker v. Howard University Hospital*, 764 F. Supp. 2d 1, 7 (D.D.C. 2011) (applying *Holowecki* to EEOC intake questionnaire for Title VII claim). However, "[a] Title VII lawsuit following the EEOC charge is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)); *see also Marshall v. Honeywell Tech. Sols., Inc.*, 598 F. Supp. 2d 57, 61 (D.D.C. 2009) (finding that EEOC intake questionnaire did not constitute charge when it did not contain or attach any description of the discriminatory conduct). And "if a filing is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action[.]" *Holowecki*, 552 U.S. at 402.

The intake questionnaire Norris points to does not constitute a charge for gender discrimination as to the January 30, 2014 demotion. Norris filed the intake questionnaire on July 25, 2014, with attachments filed on July 29, 2014.[5] *See* EEOC Intake Questionnaire at 1, 5. She

---

[5] Taking all inferences in Norris's favor, the Court ignores the discrepancy between the filing date and the signature on the EEOC Intake Questionnaire.

did check box 2 on the last page of the questionnaire, indicating that she intended to file a charge of discrimination. *See id.* at 4. However, while she checked the boxes for age and retaliation in the section addressing the reasons for her claim of discrimination, she only circled the box for sex. *See id.* at 2. And most importantly, in the attachment to the form, she only discussed discrimination on the basis of age, retaliation (based on the January 30, 2014 demotion), and briefly mentioned her race as a potential additional motive for discrimination. *See id.* at 5–7. She noted in the penultimate paragraph of her attachment that:

> [i]n addition to this age discrimination, I also experienced sexual harassment but I refused to support the claim at this time because victims of sexual harassment are victimized and conversations with sex topics are known throughout the department. Nevertheless, one of my Assistant Superintendents has made several sexual advances to me requiring sex for benefits. Conversation is one thing but sexual requests are another.

*Id.* at 7. In *Holowecki*, the plaintiff had submitted a detailed affidavit along with the intake questionnaire and the filings altogether could be "reasonably construed as a request for the agency to [act]." *Holowecki*, 552 U.S. at 402. In *Hogan*, the plaintiff alleged that she was discriminated against on the basis of sex and provided specific instances of harassment by a named employee. *See Hogan*, 764 F. Supp. 2d at 8. By contrast here, Norris failed to indicate in any way that she was demoted because of her sex, and specifically indicated on her intake questionnaire that she did *not* intend to support a claim for discrimination on the basis of sex. *See* EEOC Intake Questionnaire at 7. And even disregarding the first sentence, to the extent the penultimate paragraph in the attachment indicated any ground for discrimination on the basis of sex, it was what the Court assumes to be the sexual advances made by Walton. As in *Marshall*, where the plaintiff's "bare allegation of discrimination with nothing else" was insufficient to constitute a charge, *Marshall*, 598 F. Supp. 2d at 61, Norris's intake questionnaire cannot constitute a charge for discrimination on the basis of sex as to the January 30, 2014 demotion

when the only references to it are a circled box on the questionnaire and the mention of unconnected sexual advances by a supervisor.

### 2. July 2014 Shift Change and Failure to Assign to Metro Way and the AIT

With respect to Norris's schedule and shift change in July 2014, WMATA argues that Norris cannot establish she was subjected to an adverse employment action because the change in schedule "did not affect the terms and conditions of her employment." Def.'s Mem. Supp. at 10. Norris contends that both the failure to assign her to Metro Way and the AIT were adverse actions because both assignments would have allowed her to receive overtime pay, and the other available assignments did not. *See* Pl.'s Mem. Opp'n at 39. The parties also dispute whether WMATA has provided a legitimate, non-discriminatory reason for the failure to assign Norris to either assignment. The Court addresses both arguments, and finds that WMATA has met its burden and is entitled to summary judgment.

#### a. Adverse Employment Action

The D.C. Circuit has emphasized the "two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin." *Brady*, 520 F.3d at 493. In refining the *McDonnell Douglas* framework in *Brady*, the D.C. Circuit explained that the *prima facie* case for discrimination generally becomes irrelevant once an employer has asserted a legitimate, non-discriminatory reason for an adverse employment action. *See Brady*, 520 F.3d at 493. But "[e]ven under the streamlined *Brady* inquiry, the employee must have 'suffered an adverse employment action[.]'" *Dreidband v. Nielsen*, 319 F. Supp. 3d 314, 320 (D.D.C. 2018) (quoting *Brady*, 520 F.3d at 494). WMATA challenges whether the alleged discriminatory acts were

adverse in the first place, and the Court must resolve that issue before addressing *McDonnell Douglas*'s burden shifting framework.

An adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan,* 559 F.3d 549, 552 (D.C. Cir. 2009) (internal citations and quotations omitted). The harm suffered as a result of the action must be "objectively tangible, not [p]urely subjective[.]" *Shipman v. AMTRAK*, 241 F. Supp. 3d 114, 122 (D.D.C. 2017) (quoting *Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008)). As a result, the D.C. Circuit has emphasized that "there are few circumstances in which a mere lateral transfer can rise to the level of an adverse employment action[.]" *Jones v. District of Columbia Dep't of Corrections*, 429 F.3d 276, 281 (D.C. Cir. 2005). There must be "'materially adverse consequences affecting the terms, conditions, or privileges of [] employment'" in connection with the lateral transfer (or denial thereof), and "'[m]ere idiosyncracies of personal preference are not sufficient to state an injury.'" *Id.* (quoting *Brown v. Body*, 199 F.3d 446, 457 (D.C. Cir. 1999)).

And while overtime work can provide an employee with an objectively tangible monetary advantage, which could qualify as a material consequence when evaluating the adverseness of a lateral transfer, "working overtime . . . is not universally regarded as desirable[,]" and imposition of overtime work on an employee has been found to be an adverse action in some cases. *Bell v. Gonzalez*, 398 F. Supp. 2d 78, 97 (D.D.C. 2005) (citing *Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 76-77 & n. 5 (D.D.C. 2002)). Accordingly, while the loss of overtime can constitute an adverse action in some circumstances, *see, e.g.*, *Walker v. England*, 590 F. Supp. 2d 113, 143

(D.D.C. 2008), determining whether it does "is a fact-specific inquiry[,]" *Robinson v. District of Columbia*, 275 F. Supp. 3d 95, 105 (D.D.C. 2017).

Based on the evidence provided by Norris in her opposition, the Court finds that the failure to assign Norris to the AIT was not an adverse action. Norris argues in her opposition that she suffered an adverse action because both the Metro Way and the AIT assignments offered the opportunity for overtime, *see* Pl.'s Mem. Opp'n at 38–39, but only offers evidence to support her argument as to the Metro Way assignment. The sum total of the evidence Norris provides in support of her overtime claim can be summarized in a few sentences. The excerpts from Norris's deposition do not mention overtime. *See generally* Norris Dep. In her deposition, Walker noted that SOMs did not use to receive overtime but now do, *see* Walker Dep. 173:16–174:7, and that "SOMs assigned to [Metro Way] received no additional compensation or benefits than [sic] SOMs working in other service areas[,]" Walker Dep. 132:7–132:10. Norris stated in her declaration that the Metro Way assignment offered the opportunity for overtime. *See* Norris Decl. ¶ 20. The record before the Court is thus devoid of any evidence supporting the claim that the AIT assignment was overtime-eligible, while it contains conflicting statements as to whether the Metro Way assignment was. Similarly, Norris argues in her opposition that she "has established that she was interested in the [AIT] because of . . . comp overtime eligibility[.]" Pl.'s Mem. Opp'n at 39. This is also unsupported by any of the evidence Norris provided in support for her opposition, including in statements she made in her deposition and declaration. The only reference to Norris's interest in overtime work is in Norris's declaration, and it concerns the Metro Way assignment. *See* Norris Decl. ¶ 20.

It is axiomatic that conclusory assertions offered without any evidentiary support at the summary judgment stage do not establish a genuine issue for trial. *See Greene v. Dalton*, 164

F.3d 671, 675 (D.C. Cir. 1999). Because Norris does not provide any evidence to support her assertion that the AIT assignment was eligible for overtime or that she was interested in the assignment because of the opportunity for overtime it offered, the Court finds that there is no genuine issue of material fact and that the denial of the AIT assignment was not an adverse action. On the other hand, although skimpy, Norris did provide some evidence supporting her argument that the denial of the Metro Way assignment was adverse because of her interest in the overtime opportunity it offered, and WMATA did not address the overtime argument in its reply.[6] The Court thus declines to find that the failure to assign her to Metro Way was not adverse as a matter of law.

### b. WMATA's Asserted Legitimate, Non-Discriminatory Reason

Because Norris has offered sufficient evidence to support her argument that the failure to assign her to Metro Way was an adverse action, the Court must address *McDonnell Douglas*'s burden-shifting framework. WMATA asserts a legitimate, non-discriminatory reason for the failure to assign, and the Court must therefore "resolve [the] central question" of whether Norris "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that [WMATA] intentionally discriminated against [her][.]" *Brady*, 520 F.3d at 494. Norris cannot show that she was not selected for Metro Way because of her gender, and the Court accordingly finds for WMATA.

---

[6] The Court notes that, in order to address the subjectivity inherent in overtime considerations, other courts in this circuit have found loss of overtime to be an adverse employment action only when "the trier of fact could reasonably conclude that plaintiff in the past sought opportunities for overtime pay or it was otherwise known to defendant that plaintiff desired such opportunities." *Bell*, 398 F. Supp. 2d at 97; *see also Robinson*, 275 F. Supp. 3d at 105–06 (applying *Bell* to find that repeated denial of Plaintiff's overtime requests constituted adverse employment action).

WMATA argues in its motion that, following the elimination of the "pick" in 2013, "work assignments were distributed based on skills/experience level of the individual and the operational needs of the department." Def.'s Mem. Supp. at 11. It contends that candidates for the Metro Way assignment were thus selected according to those operational needs. *See id.* In her opposition, Norris argues that the stated reason is a pretext, and points to "several employees with less experience and skills as an [sic] SOM . . . and under the age of 40" who were selected instead of her. Pl.'s Mem. Opp'n at 39. WMATA retorts in its reply that two of four employees chosen for Metro Way were women, and that all four "were better fits for the program." Def.'s Reply at 6.

On one hand, Norris has provided evidence to dispute WMATA's asserted legitimate, non-discriminatory reason for the failure to assign her to Metro Way. While WMATA argues that work assignments were distributed in part based on experience, Norris points out, and WMATA does not dispute, that the four employees selected for the Metro Way assignment had much less experience than she did. *See* Pl.'s Mem. Supp. at 40; Pl.'s Work Assignment Sheet at 4. WMATA asserts in its reply that the employees selected were "better fits for the program[,]" but does not support that assertion with any evidence from the record. Def.'s Reply at 6.[7] WMATA does not explain in any way how the individuals selected were better skilled than Norris or better fit WMATA's operational needs. There is therefore a dispute as to the validity of its asserted legitimate, non-discriminatory reason.

---

[7] In its reply, WMATA cites to its response to Norris's third interrogatory in support for the claim that the employees selected were better qualified. *See* Def.'s Reply at 6. However, its response to the third interrogatory is a table listing the name, sex, and date of birth of all employees selected for Metro Way between 2014 and 2017. *See* Def.'s Resps. To Pl.'s Interrogs. ¶ 3, Pl.'s Ex. 11, ECF No. 19. The table does not offer any evidence to support the claim that those employees were better qualified than Norris.

On the other hand, Norris does not point to any evidence suggesting that the asserted legitimate, non-discriminatory reason was a pretext *for gender discrimination*. To prevail once an employer has asserted a legitimate, non-discriminatory reason for an adverse employment action, the employee must show that the reason was pretext and that the actual motive was discrimination. *See Brady*, 520 F.3d at 494. And when an employer selects for a position or for promotion an employee of the same protected category as the complaining employee, there is a strong inference against discrimination. *See Murray v. Gilmore*, 406 F.3d 708, 715 (D.C Cir. 2005) (finding that employee's claim for discriminatory termination on the basis of race could not survive summary judgment because, even assuming pretext, she was replaced by another employee of the same race); *Brown v. Brody*, 199 F.3d 446, 451 (D.C. Cir. 1999), *abrogated on other grounds by Burlington Northern & Santa Fe Ry.*, 548 U.S. at 53 (finding with respect to employee's non-selection for desirable transfer that district court "correctly observed that any sexual discrimination claim would be baseless because two of the three employees selected for that transfer were women").

In *Murray*, the D.C. Circuit emphasized that its ruling "[did] not mean that a jury could never infer discrimination when the plaintiff was replaced by a member of the same protected class[,]" and gave the example of a situation where an employer "fired ten African–American employees for pretextual reasons and replaced them with nine whites and one African American." 406 F.3d at 715. Under those circumstances, the D.C. Circuit explained that the employee replaced by an African-American could "most likely" survive summary judgment. *Id.* However, since the plaintiff in *Murray* had provided no evidence to suggest such a situation at the summary judgment phase, the D.C. Circuit found that no reasonable jury could infer race discrimination from her firing. *See id.* Here, Norris's situation is similar to the plaintiff's in

*Murray*. While all four employees selected for Metro Way appear to have been young and inexperienced compared to Norris, it is uncontested that two of the four were women. *See* Pl.'s Mem. Opp'n at 40; Def.'s Reply at 6. As in *Murray*, Norris does not provide any evidence of gender discrimination to counter the strong inference against discrimination their selection creates. The Court accordingly grants summary judgment to WMATA.

Because Norris did not exhaust her administrative remedies with respect to the January 30, 2014 demotion, the July 2014 failure to assign Norris to the AIT did not constitute an adverse action, and Norris cannot overcome WMATA's asserted legitimate, non-discriminatory reason for the July 2014 failure to assign her to Metro Way, the Court grants the motion for summary judgment in its entirety as to the gender discrimination claim.

### B. Retaliation

As with Norris's gender discrimination claim, WMATA contends that Norris cannot prevail on her retaliation claim. Norris, however, points to the January 30, 2014 demotion, failure to assign to Metro Way, and failure to assign to the AIT, as sufficient to support her retaliation claim. For the reasons stated below, the Court denies the motion for summary judgment as to the January 30, 2014 demotion and July 2014 failure to assign to Metro Way, but otherwise grants it.

### 1. January 30, 2014 Demotion

Inexplicably, despite Norris stating that her retaliation claim is in part based on the January 30, 2014 demotion on multiple occasions in this litigation, including in her opposition to the motion for summary judgment, *see* Pl.'s Mem. Opp'n at 22–23, WMATA entirely fails to address the argument in either the motion or its reply. However, WMATA does argue that it has a legitimate, non-discriminatory reason for Norris's demotion in response to her gender

discrimination claim. *See* Def.'s Reply at 4–5. The Court, therefore, considers whether Norris has provided sufficient evidence for a reasonable jury to find that the asserted reason was a pretext for retaliation. The Court finds that she has.

To establish a *prima facie* case of retaliation, Norris must show "that (1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection exists between the two." *Carney v. American Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998) (citing *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)). Informally complaining to an employer about discrimination is covered as a protected activity under Title VII, *see, e.g.*, *Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 27 (D.D.C. 2007), and showing temporal proximity between the protected activity and the adverse action is sufficient to satisfy the causal connection requirement, *see Carney*, 151 F.3d at 1095. WMATA presents no arguments to refute that Norris met her *prima facie* case, but it does point to a legitimate, non-discriminatory reason for the demotion in the form of the January 30, 2014 demotion memo. Under the *McDonnell Douglas* framework, the Court must therefore assess whether Norris has provided sufficient evidence to reasonably suggest that the stated reason was a pretext, considering both the *prima facie* case, evidence that the stated reason is incorrect, and any other evidence. *See Carter*, 387 F.3d at 878.

Norris has provided sufficient evidence challenging the asserted non-retaliatory reason for her demotion to survive summary judgment. First, Norris asserts in her declaration that she complained of harassment to Harrington and Baker on several occasions, including on January 27, 2014, *see* Norris Decl. ¶ 12–13, and WMATA makes no argument to refute that the complaints occurred. The undisputed facts thus show that Norris's demotion was an adverse action causally connected to protected activity that occurred just a few days earlier. Second,

WMATA points to the January 30, 2014 demotion memo to support its claim that Norris was demoted because she performed inadequately during her probationary period. *See* Def.'s Reply 4–6. However, Norris provides evidence casting doubt on the legitimacy of each example of conduct that WMATA claims forms the basis for its non-retaliatory reason.

The demotion memo states that Norris repeatedly communicated with staff without first clearing the communications with Harrington, despite Harrington giving Norris a verbal warning on the issue following a December 2, 2013 communication, *see* Demotion Memo at 1, and Norris herself acknowledges that she received a "verbal warning or a directive to refrain from sending . . . emails to staff without prior approval[.]" Norris Dep. 82:3–82:11. But Norris also states that she followed the directive, *see id.*, and provides e-mails sent between December 2013 and January 2014 showing that she requested approval on a variety of communications, *see* Approval E-mails, Pl.'s Ex. 6, ECF No. 19. Norris also asserts that she followed the directive in her declaration. *See* Norris Decl. ¶ 16. WMATA argues that Norris's evidence is unconvincing but provides no contrary evidence in its reply. *See* Def.'s Reply at 5–6.

WMATA further supports the demotion by pointing to complaints for harassment made by two SOMs against Norris in January 2014, "which [WMATA] . . . concluded as having merit." Demotion Memo at 1. Norris first rebuts this assertion by pointing to a letter written by one of the complaining SOMs, Claire Fenelus, indicating that her complaint was resolved at a meeting prior to Norris's demotion. *See* Fenelus Letter. WMATA notes in its reply that Fenelus's letter "uses hindsight to rationalize Ms. Fenelus' filing of her . . . claim" but "does not invalidate that a . . . claim was filed." Def.'s Reply at 5.[8] However, WMATA does not contest

---

[8] While the Court notes that Fenelus's letter is unsworn, it is up to the parties to object to the admissibility of evidence under Fed. R. Civ. P. 56(c)(2). Because WMATA has not objected, the Court considers the Fenelus letter in its determination.

that the letter contradicts the demotion memo's assertion that WMATA found Fenelus's harassment claim to have merit after the meeting. With respect to the complaint by the other SOM, Sharron Young, WMATA supports the demotion by reference to a meeting held with WMATA's Office of Equal Employment and Employee Relations ("EEOR") where Norris allegedly declined to discuss the matter. *See* Demotion Memo at 2. But Norris states in her deposition that Young's harassment charge was dropped at the conclusion of the meeting. *See* Suppl. Norris Dep. 29:7–29:10.

Finally, WMATA justifies the demotion by arguing that Norris verbally approved hotel stays for SOMs without authorization on January 21, 2014 and was involved in a dispute with Pinkard on January 22, 2014, *see* Demotion Memo at 2, both of which Norris denies, *see* Norris Decl. ¶ 16. Again, WMATA provides no supporting evidence in reply.

Several courts have found that an employee who challenges an asserted legitimate, non-discriminatory reason only by providing evidence in the form of subjective, "self-serving and conclusory statement[s]" denying the asserted reason does not establish a genuine issue of material fact that can survive summary judgment. *E.g. Hastie v. Henderson*, 121 F. Supp. 2d 72, 81 (D.D.C. 2000); *Akridge v. Gallaudet Univ.*, 729 F. Supp. 2d 172, 182 (D.D.C. 2010). However, the D.C. Circuit has also emphasized that "'there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion.'" *Desmond v. Mukasey*, 530 F.3d 944, 964 (D.C. Cir. 2008) (quoting *George*, 407 F.3d at 413). In *Hastie*, the plaintiff asserted without any supporting evidence that she had completed more work than another employee who had received a higher performance rating than her. *See Hastie*, 121 F. Supp. 2d at 80–81. In *Akridge*, the plaintiff stated in her deposition that she was better qualified than other candidates for the same position

but provided no evidence to back that assertion. *See Akridge*, 729 F. Supp. 2d at 182. By contrast, Norris does not make subjective, conclusory statements regarding circumstances over which she lacks personal knowledge, but rather denies that she engaged in specific acts.

Moreover, as in *Desmond*, Norris's statements are backed in several instances with additional evidence. In *Desmond*, a former FBI trainee challenged his dismissal for failure to "meet the suitability requirements of emotional maturity and cooperativeness." *Desmond*, 530 F.3d at 952. Desmond challenged each alleged instance of improper conduct mentioned in his dismissal letter, and provided evidence in the form of deposition testimony by FBI agents to support his own statements. *See id.* at 963. Norris similarly backs her statements with copies of e-mails and with a letter by one of the employees involved in the events alleged to form the basis for her termination. And Norris's performance evaluation for 2013 is devoid of any comment mirroring those in the demotion memo, *see* 2013 Performance Evaluation, Pl.'s Ex. 4, ECF No. 19, despite the fact that the performance evaluation was completed in May 2014 and that several of the alleged instances of improper conduct described in the demotion memo occurred in December 2013.[9] The performance evaluation fails to mention a failure to comply with supervisory directive or an inability to work well with subordinates. *See id.* Instead, not only did Norris receive an overall performance rating of "solid performer[,]" *see id.* at 9, but mistakes

_____

[9] It is unclear whether Norris's 2013 performance evaluation covered only her performance as a SOM or both her performance as a SOM and as an assistant superintendent. The evaluation form states that Norris's role is "Service Operations Manager[,]" but also that the performance period is from January 1, 2013 to December 31, 2013, a month after Norris transitioned to assistant superintendent. *See* 2013 Performance Evaluation. Drawing "all justifiable inferences . . . in [her] favor" at the summary judgment phase, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986), the Court infers that the performance evaluation covered the assistant superintendent position because Norris changed positions on December 1, 2013.

in the score calculation for her overall rating apparently prevented her from obtaining an accurate rating of "role model[,]" *see id.*; Walker Dep. 100:17–105:20.

And finally, Norris has provided evidence that supports an inference of retaliatory intent. In addition to the extremely short period of time between the time she raised her complaints and her demotion, Norris further alleges that Baker told her during her time as an Assistant Superintendent that she was "documenting" and therefore could not be trusted. *See* Norris Dep. 76:16–77:13. None of this is rebutted by WMATA in its reply.

Given that WMATA's asserted legitimate, non-retaliatory reason for Norris's demotion is supported solely by the demotion memo, *see* Def.'s Reply at 4, and that Norris has put forward evidence both rebutting the asserted reason and suggesting a retaliatory motive, there remains a genuine issue of material fact as to the reason for the demotion and a reasonable juror could conclude that retaliation was the actual motive. Consequently, the Court denies summary judgment on the retaliation claim as to the January 30, 2014 demotion.

### 2. July 2014 Shift Change and Failure to Assign to Metro Way or the AIT

As with Norris's gender discrimination claim, WMATA argues that it is entitled to summary judgment because the July 2014 shift change was not an adverse action supporting a claim for retaliation under Title VII, and because it has a legitimate, non-retaliatory reason for Norris's non-selections. In response, Norris again claims that the lost opportunity for overtime created by the AIT and MetroWay assignments is sufficient for the shift change to be adverse, and argues that the proffered legitimate, non-retaliatory reason is a pretext for retaliation. The Court denies summary judgment as to the failure to assign to Metro Way but otherwise grants it.

"In the retaliation context, an 'adverse action' has a broader meaning than in a discrimination context." *Boone v. MountainMade Found.* 64 F. Supp. 3d 216, 232 (D.D.C.

2014) (quoting *Baird v. Gotbaum,* 662 F.3d 1246, 1248–49 (D.C. Cir. 2011)). An employment

action can be adverse in the context of a retaliation claim if the alleged retaliatory act "well

might have 'dissuaded a reasonable worker from making or supporting a charge of

discrimination.'" *Burlington Northern & Santa Fe Ry. v. White,* 548 U.S. 53, 68,

(2006) (quoting *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Norris fails to meet

even this more permissive standard with regards to the failure to assign her to the AIT.

As discussed in part IV.A.2., Norris only supports her argument that the failure to assign

her to the AIT or Metro Way was sufficiently adverse by arguing that her non-selection to these

two positions denied her the opportunity to earn overtime. This argument is supported only by

two sentences in her declaration, noting 1) that Metro Way was overtime-eligible, and 2) that she

was interested in Metro Way because of that overtime eligibility. *See* Norris Decl. ¶ 20. Absent

any evidence regarding the availability or desirability of overtime for the AIT, the Court finds

that Norris's non-selection to the AIT was not adverse. Because Norris did support her argument

that her non-selection to Metro Way was adverse, the Court turns to *McDonnell Douglas*'s

burden-shifting framework. The Court accordingly considers whether Norris has provided

sufficient evidence to reasonably suggest that the stated reason for her non-selection to Metro

Way was a pretext concealing retaliation, considering both the *prima facie* case, evidence that

the stated reason is incorrect, and any other evidence. *See Carter*, 387 F.3d at 878.

As an initial matter, it is unclear whether Norris has established her prima facie case of

retaliation. Norris must show "that (1) she engaged in statutorily protected activity; (2) her

employer took an adverse personnel action against her; and (3) a causal connection exists

between the two." *Carney v. American Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998) (citing

*Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)). Norris argues that she engaged in

protected activity as late as April 2014, *see* Pl.'s Mem. Opp. at 38, and the non-selection to

Metro Way occurred at some point in mid-to-late July, *compare* Work Selection Choices

(selecting a Metro Way shift as a preferred assignment as of July 16, 2014), *with* July 29, 2014

Harrington E-mail (indicating as of July 29, 2014 that Norris did not get the Metro Way

assignment).  Taking all inferences in Norris's favor, and assuming that her April 2014

complaint occurred towards the end of April, at a minimum two and a half months elapsed

between Norris's protected conduct and her non-selection to Metro Way.

     Norris contends that a causal connection exists "because of the short two-month period

between the two events[,]" and cites to caselaw in this circuit supporting that position.  Pl.'s

Mem. Opp'n at 39.  But without more, it is unclear whether a gap of two and a half months is

sufficient to support an inference of retaliation.  *Compare Taylor v. Solis*, 571 F.3d 1313, 1322

(D.C. Cir. 2009) (noting when considering two and a half months gap that "an inference of

retaliatory motive based upon the 'mere proximity' in time . . . would be untenable on the record

here"), *and Walker v. Johnson*, 798 F.3d 1085, 1093 (D.C. Cir. 2015) (explaining that the D.C.

Circuit "previously rejected as 'untenable'" an inference of retaliation based upon a two and a

half month gap, and rejecting inference of retaliation when protected activity occurred on April 7

and adverse action on June 25) (quoting *Taylor*, 571 F.3d at 1322), *with Hamilton v. Geithner*,

666 F.3d 1344, 1357–58 (noting that the D.C. Circuit has not established a bright-line rule and

"[i]nstead . . . evaluate[s] the specific facts of each case to determine whether inferring causation

is appropriate"), *and Kilby-Robb v. Devos*, 247 F. Supp. 3d 115, 129 (D.D.C. 2017) (noting that

"to rely on temporal proximity to prove causal relation, the temporal proximity must be 'very

close'—generally less than three months) (quoting *Lane v. Vasquez*, 961 F. Supp. 2d 55, 67

(D.D.C. 2013)).  The Court does not resolve this issue because WMATA does not address it in its reply.

On the other hand, as discussed in part IV.A.2., Norris provides evidence to dispute the alleged legitimate, non-retaliatory reason for her non-selection to Metro Way.  WMATA argues that work assignments were distributed based on skills, experience, and the needs of the business during the July 2014 assignment process, Def.'s Mem. Supp. at 11, but Norris points out that she had vastly more experience than the four employees selected for the Metro Way assignment, *see* Pl.'s Mem. Opp'n. at 40.  In July 2014, Norris had over a decade of experience as a SOM, while the four employees selected all had very low seniority at WMATA.  *See* October 20, 2014 Pick Spreadsheet.  One of the selected employees, Shikeara DeCruise, had been a SOM for less than a year.  *See* Walker Dep. 134:2–134:6.  WMATA summarily argues that the four employees were more qualified in its reply but does not explain why, or provide any evidence to support its argument that they provided a "better fit[]."  Def.'s Reply at 6.  When challenging an asserted legitimate, non-retaliatory reason based on qualifications, a qualifications gap between the Plaintiff and the employee selected can justify an inference of retaliation when it is "great enough to be inherently indicative" of retaliation.  *Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010) (citing *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008)).  Here, Norris argues that she had significantly more seniority than all the selected employees, and vastly more experience as a SOM than at least one of them.  WMATA fails to respond to the argument in its reply, or to point to any evidence of the selected employees' better qualifications. The evidence on the record thus indicates that there is a dispute of material fact as to whether WMATA's professed legitimate, non-retaliatory reason was a pretext for retaliation.

WMATA alternatively argues that Norris cannot prevail on her retaliation claim because there is "no evidence that the manager who made the selection, Mr. William Proctor, had any idea that [she] was engaging in protected activity." Def.'s Reply at 6. The evidence on the record contradicts WMATA's assertion as to who was responsible for the Metro Way selection. WMATA does provide evidence that Proctor was solely responsible for assigning employees to Metro Way. *See* Baker Aff. ¶¶ 23–24. However, one of the facts the parties indicated was not in dispute is that "Assistant Superintendents worked collaboratively with the Superintendent of Bus Services to identify and recommend the work assignment for each SOM. Recommendations were then submitted to Director Baker for review and approval." Pl.'s Statement of Facts ¶ 10. This supposedly undisputed fact suggests that Baker, who was aware of multiple instances of protected activity by Norris, was the one with ultimate approval authority for Metro Way. There is therefore a dispute of material fact as to who had final say with regards to the Metro Way assignment, and WMATA's argument fails.

Because there is sufficient dispute with respect to WMATA's asserted legitimate, non-retaliatory reason for the Metro Way non-selection for a jury to reasonably find it to be false and a pretext for retaliation, the Court denies summary judgment as to retaliation based on the failure to assign Norris to Metro Way.

### C. *Quid Pro Quo* Sexual Harassment

Norris brought a claim for quid pro quo sexual harassment based on Walton's alleged June 2014 statements offering to get her a spot on the AIT in exchange for sexual favors and her

subsequent non-selection to the AIT.[10] WMATA contends that Walton's lack of ultimate control over the AIT assignment process entitles it to summary judgment. The Court disagrees.

"[T]he gravamen of a quid pro quo claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse [employment] consequences follow from the employee's refusal." *Burton v. Batista*, 339 F. Supp. 2d 97, 109 (D.D.C. 2004) (quoting *Gary v. Long*, 59 F.3d 1391, 1396 (D.C. Cir. 1995)). Under the *McDonnell Douglas* burden-shifting framework,[11] the plaintiff must first make out its prima facie case, and show 1) that she was a member of a protected class; 2) that she was subjected to unwelcome sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcome advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the

---

[10] In her responses to WMATA's interrogatories, Norris indicated that "[t]he sexual harassment claim was dropped since WMATA reported Alfonzo Walton did not play a part in denying Plaintiff the opportunity to work the accident investigation assignment." Pl.'s Resps. Def. Interrogs. ¶ 5, Pl.'s Ex. 9, ECF No. 19. However, in response to WMATA's Motion for Summary Judgment, Norris now asserts that the claim is not waived after all, because "additional evidence has developed after answering her interrogatories." Pl.'s Mem. Opp'n at 40 n.6. Norris never amended her complaint or otherwise indicated to the Court that she intended to drop the claim, and WMATA does not contend that it was prejudiced by the waiver's retraction at the summary judgment stage. WMATA also presents substantive arguments regarding the claim in its motion and reply. The Court will therefore review Norris's arguments against summary judgment. However, the Court notes that under the Federal Rules of Civil Procedure, a party is required to supplement its responses to interrogatories "in a timely manner if the party learns that in some material respect the . . . response is incomplete or incorrect[.]" Fed. R. Civ .P. 26(e). If Norris did not supplement her responses to WMATA's interrogatories after discovering additional evidence, she failed to comply with the clear requirements of Rule 26.

[11] The D.C. Circuit has not expressly indicated whether the burden-shifting standard of *McDonnell Douglas* applies to *quid pro quo* sexual harassment claims. However, several other circuits and courts in this circuit have analyzed *quid pro quo* sexual harassment claims under *McDonnell Douglas*. *See, e.g.*, *Heyne v. Caruso*, 69 F.3d 1475, 1478–79 (9th Cir. 1995); *Spencer v. General Elec. Co.*, 894 F.2d 651, 659 (4th Cir. 1990), *abrogated on other grounds by Farrar v. Hobby*, 506 U.S. 103 (1992); *Akonji v. Unity Healthcare*, 517 F. Supp. 2d 83, 93–94 (D.D.C. 2007).

supervisor's sexual demands resulted in an adverse job consequence; and (5) that respondeat superior liability exists. *See Stone-Clark v. Blackhawk, Inc.*, 460 F. Supp. 2d 91, 95 (D.D.C. 2006). WMATA argues that Norris has not satisfied elements 2 and 4 of her prima facie case because her allegations of sexual harassment were unverified and because Walton was not the ultimate decisionmaker for the AIT assignment.[12]

First, WMATA argues that Norris was not subjected to sexual advances or sexual favors. WMATA notes that "[a]fter being interviewed for a different sexual harassment investigation, Plaintiff . . . filed her own claim of sexual harassment[.]" Def.'s Mem. Supp. at 4. WMATA also points out that it "promptly conducted its investigation . . . and concluded there was no evidence to support . . . sexual harassment." *Id.* at 5. But while the timing of Norris's sexual harassment claim and the results of WMATA's subsequent investigation may be relevant to the veracity of that claim, the Court cannot make credibility determinations on summary judgment. *See Czekalski*, 475 F.3d at 363. WMATA's argument as to element 2 of the prima facie case is essentially an attack on Norris's credibility, because it is her word against Walton's. The Court will not address it at the summary judgment stage, and will leave the credibility determination for trial.[13]

---

[12] WMATA does not make any arguments as to whether the AIT assignment was a "job benefit" or whether Norris's non-selection to the AIT was an "adverse job consequence." WMATA also does not indicate whether either standard is equivalent to the "adverse employment action" standard in a discrimination or retaliation claim. Because WMATA does not make the argument, the Court does not consider it.

[13] Besides, the Court notes that Norris has corroborating evidence to support her allegations. The WMATA employee who interviewed Norris regarding her allegations against Walton noted that Norris "reiterated a lot of what [the employee] heard from other female witnesses about how Mr. Walton spoke to women, flirted, was very unprofessional[.]" Walker Dep. 166:7–166:10. And WMATA itself acknowledged in its responses to Norris's interrogatories that "[t]he investigation revealed that it is highly unusual that several women, who have worked with a male colleague, would accuse him of sexual harassment, if nonce [sic] has ever occurred." Def.'s Resps. to Pl.'s Interrogs. ¶ 9.

Second, WMATA contends that Walton did not have the authority to appoint Norris to the AIT, because the assistant superintendents worked together to recommend candidates for Baker's final approval. *See* Def.'s Mem. Supp. at 5. However, while Norris does not dispute the process through which AIT assignments were made, *see* Pl.'s Statement of Facts ¶¶ 14–15, she notes that 1) Walton was one of the employees involved in making the recommendations for the AIT assignment, and 2) she has evidence indicating that Walton played a role in her not receiving the assignment. *See* Pl.'s Mem. Opp'n at 41–42. In the July 29, 2014 e-mail, Harrington told Norris that she was not selected "based on [her] comments given to Mr. Walton" about her preference to stay in Virginia. July 29, 2014 Harrington E-mail. Taking all inferences in Norris's favor, it would not be unreasonable for a jury to believe that Walton was directly responsible for Norris not being recommended for the AIT assignment, by making comments to others involved in the selection process to ensure that she would not be considered.

WMATA does not provide a legitimate reason for Norris's non-selection in response to her retaliation claim, but since it did so in response to her gender discrimination claim based on the same event, the Court briefly addresses it. In its motion, WMATA argues that it selected SOMs for the AIT "based on the operational needs of the department and in consideration of [Norris's] written choices." Def.'s Mem. Supp. at 11. WMATA notes that "[n]one of the AIT assignments were located in the Four Mile Region," when Norris "expressed a desire in her written choices to remain in the Four Mile Region." *Id.* It concludes that "an appointment to the AIT would have been inconsistent with Plaintiff's written preferences" and that Norris ultimately received an assignment from her list of preferences. *Id.* WMATA supports its claims regarding the AIT assignment's availability with a spreadsheet of July 2014 work assignments, showing no AIT assignment in the Four Mile Region. *See* Def.'s Work Assignment Spreadsheet, Def.'s Ex.

3, ECF No. 17. But Norris retorts in her opposition that there *were* AIT assignments in the Four Mile Region, and supports her allegations with a version of the very same spreadsheet containing additional pages showing that two employees assigned to the AIT in July 2014 worked out of the Four Mile Region. *See* Pl.'s Work Assignment Sheet. Because Norris provides evidence that directly contradicts the asserted legitimate, non-discriminatory reason, a reasonable juror could find that the asserted reason is a pretext covering up *quid pro quo* sexual harassment.[14]

### D. Hostile Work Environment

WMATA argues that it is entitled to summary judgment on Norris's hostile work environment claim because the single instance of alleged sexual harassment by Walton is not enough to create a hostile work environment. Def.'s Mem. Supp. at 6–7. Norris retorts that the claim is supported not just by Walton's actions and her non-selection to the AIT, but also by a multitude of other incidents between January and July 2014. *See* Pl.'s Mem. Opp'n at 43–44. Because the evidence in the record, when taking all inferences in Norris's favor, points to pervasive enough conduct to reasonably be perceived to constitute a hostile work environment, the Court denies the motion for summary judgment as to the hostile work environment claim.

---

[14] WMATA advances a different argument in its reply, and instead claims that Norris was not assigned to the AIT because "she selected shifts that were not compatible to the Accident Team" and WMATA honored "her desire to remain on those exact shifts[.]" Def.'s Reply at 6 (citing Work Selection Choices). This argument is also unavailing. First, courts generally decline to consider arguments raised for the first time in a reply brief. *See, e.g.*, *Dorriz v. District of Columbia*, 133 F. Supp. 3d 186, 196 (D.D.C. 2015) (citing *Am. Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008) and rejecting summary judgment on the basis of arguments raised in reply). Second, Norris indicated in her deposition that the AIT assignment could not be selected on the work preferences form employees filled out in July 2014. *See* Norris Dep. 135:1–135:14. WMATA does not provide any evidence to the contrary. A reasonable juror could therefore find that this second asserted legitimate, non-retaliatory reason is false and a pretext for retaliation.

To make a *prima facie* case of hostile work environment under Title VII, an employee must establish "(1) [that] the employee was a member of a protected class; (2) [that] the employee was subjected to unwelcome sexual harassment; (3) [that] the harassment complained of was based upon sex; (4) [that] the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment; and (5) the existence of respondeat superior liability." *Lyles v. District of Columbia*, 17 F. Supp. 3d 59, 67 (D.D.C. 2014) (quoting *Davis v. Coastal Intern. Sec., Inc.*, 275 F.3d 1119, 1122 (D.C. Cir. 2002)). Importantly, sexual harassment rises to the level of creating a hostile work environment "only if it is 'so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment.'" *Taylor*, 571 F.3d at 1318 (quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67 (1986)). Courts must "look[ ] to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201.

WMATA argues that the single allegation of sexual harassment by Walton is not sufficiently severe or pervasive to alter the conditions of Norris's employment. *See* Def.'s Reply at 6. However, when considering all the evidence, Norris points to multiple instances of conduct that together could be reasonably construed as pervasive enough to support a claim for hostile work environment. In her opposition, Norris alleges that she was subjected to unwelcome sexual advances by Walton, who offered to get her the AIT position if she would "keep a secret from [her] husband" and "give [him] some of that[.]" Pl.'s Mem. Opp'n at 43. In connection with her demotion, she alleges that her request for a meeting with Fenelus was delayed for 30 days. *See id.* at 44. After she was demoted, she alleges that she was "returned to BLTR under the

supervision of Ms. Pinkard, who provided supporting information for [her] demotion[,]" *id.* at 43, her leave requests went unanswered for a lengthy period of time without explanation, *see id.* at 44, her schedule adjustment requests were denied, *see id.*, she was denied an open slot on a Four Mile shift, *see id.*, an early straight shift was eliminated in May 2014, *see id.*, and she was "assigned to a very dirty old vehicle and refused detail services for the vehicle." *Id.* And finally in connection with the July 2014 assignment process, Norris alleges that she was denied the AIT and Metro Way assignment, and received her sixth choice for a work assignment. *See id.*

Beyond the arguments made in Norris's opposition, the record before the Court contains a number of significant additional facts. Norris mentioned in her EEOC charge that "Walton would regularly, when speaking to her, make inappropriate and sexually explicit and offensive comments[,]" *see* EEOC Charge at 3, and in her WMATA complaint she noted that the June 2014 advances were "not the first time Mr. Walton made sexual advances towards [her][,]" WMATA Formal Discrimination Complaint at 2. In the complaint in this case, Norris similarly stated that Walton had made inappropriate comments to her starting in May 2014, including that her and her husband "ain't doing nothing" and she "ought to give [him] some." Compl. ¶ 67. She stated that Walton had placed his hand on her knee on several occasions. *See* Compl. ¶ 78. And WMATA itself noted in October 2014 that Norris had reported that "after [she] began reporting to Mr. Walton, he began asking [her] for sexual favors[,] . . . frequently talked about sex[,] . . . [and] would sometimes put his hand on [her] knee[] during conversations." October 21, 2014 WMATA Findings Letter, Def.'s Ex. 6, ECF No. 17. WMATA also acknowledged that Walton was disciplined for sexually harassing another SOM. Walker Dep. 108:15–108:21. In the course of that investigation, WMATA "heard from other female witnesses about how Mr. Walton spoke to women, flirted, [and] was very unprofessional[.]" *Id.* at 166:4–166:14. Walton

received a fifteen day suspension and a 6-month suspension of his supervisory duties, but WMATA's EEOR did not recommend a demotion—and Walton was not demoted—in part due to the fact that "within . . . the bus department, there's a lot of fraternization" that the EEOR had to take into consideration. *Id.* at 109:1–109:16.

Taking all inferences in Norris's favor, the record thus points to 1) one instance of sexual advances by Walton in June 2014, the rejection of which may have caused Norris to lose a position on the AIT team, and 2) multiple instances of harassing verbal and physical conduct by Walton over the prior months, including sexual advances and touching Norris on the knee on several occasions. This goes well beyond the "single proposition by an assistant superintendent" that WMATA contends forms the basis for Norris's claim. Pl's Mem. Supp. at 6.

In this circuit, "even multiple instances of physical contact and sexual advances may not be sufficient" to sustain a hostile work environment claim, and "incidents involving only verbal comments . . . must generally be quite pervasive and severe to be actionable." *Bergbauer v. Mabus,* 934 F. Supp. 2d 55, 77 (D.D.C. 2013).[15] Courts in this circuit have accordingly granted employers summary judgment on hostile work environment claims involving multiple isolated incidents. *See, e.g.*, *Akonji*, 517 F. Supp. 2d at 97–99 (finding no hostile work environment despite five distinct instances of sexual harassment by co-workers over eighteen months,

---

[15] On the other hand, the D.C. Circuit recently suggested that a single, extremely severe verbal comment alone could support a hostile work environment claim in the race discrimination context, which begs the question whether sufficiently severe, isolated instances of sexual harassment may do so as well. *See Ayissi-Etoh v. Fannie Mae,* 712 F.3d 572, 577 (D.C. Cir. 2013) (noting that use of deeply offensive racial epithet on one occasion "might well have been sufficient to establish a hostile work environment"); *see also Jones v. Family Health Ctrs. of Baltimore*, 135 F. Supp. 3d 372, 379 (D. Md. 2015) (citing *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (en banc)) (noting that the Fourth Circuit found a single slur sufficient to engender a hostile work environment in *Boyer-Liberto*, and finding that "[i]f isolated uses of an offensive epithet can render a workplace hostile, . . . unwanted sexual contact can do so as well").

including touching plaintiff's buttocks and thigh, trying to kiss her, calling her beautiful, and asking her to accompany him on weekend trip); *Carter v. Greenspan,* 304 F. Supp. 2d 13, 25 (D.D.C. 2004) (finding no hostile work environment despite co-worker touching plaintiff on her knee, placing her breast on his arm, and placing her fingers on his buttocks on separate occasions).

However, the conduct at issue here is pervasive enough to be distinguishable from those cases. Norris returned to work in April 2014, after taking leave in March 2014 following her demotion, and she alleges that Walton began making inappropriate comments to her soon thereafter, *see* Compl. ¶ 67; October 21, 2014 WMATA Findings Letter. Norris alleges in her complaint that Walton made "increasingly inappropriate statements toward [her][,]" Compl. ¶ 67, and provides evidence that the inappropriate statements eventually escalated to a request for a *quid pro quo* exchange of sex for a work assignment in June 2014, *see* Norris Decl. ¶ 27. In *Akonji*, the plaintiff pointed to five incidents spread out over eighteen months. *See* 517 F. Supp. 2d at 97–99. In *Carter*, the plaintiff pointed to three incidents over three months. *See* 304 F. Supp. 2d at 19. The evidence on the record here points to at a minimum five incidents within two months, escalating to a very severe incident in which a work assignment was conditioned upon Norris's acceptance of sexual advances. And Norris alleged that Walton "*would* make increasingly inappropriate statements" and "*would* . . . sometimes put his hand on [her] knee" in the period leading to his final sexual advances in connection with the AIT assignment, Compl. ¶¶ 67, 78 (emphasis added), suggesting that the incidents "were ongoing, and happened repeatedly." *Lyles*, 17 F. Supp. 3d at 68.

Taking all the evidence on the record, none of which WMATA addresses in its motion for summary judgment aside from the *quid pro quo* request for sexual favors, Norris has alleged

a pattern of behavior by Walton over several months that includes repeated requests for sexual favors and unwanted touchings, and culminated in a *quid pro quo* request for sexual favors in exchange for an assignment on the AIT. The Court finds that the behavior is sufficiently severe or pervasive that a reasonable juror could find that it altered the conditions of Norris's employment. WMATA's motion for summary judgment as to the hostile work environment claim is denied.

## V. CONCLUSION

For the foregoing reasons, WMATA's Motion for Summary Judgment is GRANTED as to Norris's gender discrimination claim. WMATA's motion is GRANTED as to Norris's claim for retaliation except as to the January 30, 2014 demotion and July 2014 non-selection to Metro Way, and is DENIED as to Norris's claim for retaliation based on the January 30, 2014 demotion and July 2014 failure to assign to Metro Way. WMATA's motion is DENIED as to Norris's *quid pro quo* sexual harassment and hostile work environment claims. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: October 19, 2018                                         RUDOLPH CONTRERAS
                                                                United States District Judge